UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN ARGYLE,            )<br>　　Plaintiff                            )<br>                                            )<br>v.                                         )<br>                                            )<br>CONCORD ELECTRIC SUPPLY, LTD., )<br>CITY ELECTRIC SUPPLY COMPANY, )<br>AND ASHLEY MACKIE        )<br>　　Defendants.                    ) | PLAINTIFF'S COMPLAINT<br>AND DEMAND FOR TRIAL<br>BY JURY |

**I.    PARTIES**

1. The Plaintiff, Stephen Argyle, is an individual residing in Marshfield, Massachusetts.

2. The Defendant, Concord Electric Supply, Ltd. also known as Concord Electric Supply Company ("Concord Electric"), is a foreign corporation with a principal business address at 6827 N. Orange Blossom Trail, Suite 6, Orlando, Florida 32810.  Concord Electric Supply, Ltd., does business in the Commonwealth of Massachusetts through offices in, among other locations, Wilbraham and Marshfield.  At all relevant times herein, Concord Electric, was a joint employer of Argyle and part of the single enterprise that included City Electric.

3. Defendant, City Electric Supply Company ("City Electric"), is a business entity formed in the State of Florida, with a principal place of business in Wilbraham, Massachusetts.  At all relevant times herein, City Electric, was a joint employer of Argyle and part of the single enterprise that included Concord Electric.

1

4. Defendant, Ashley Mackie, is an individual residing in Switzerland. At all relevant times herein, Ashley Mackie was a joint employer of Argyle and an owner of the single enterprise that includes Concord Electric and City Electric.

## II.  JURISDICTION

5. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1332 (a).

## III.  FACTS OF THE COMPLAINT

6. In 1984, while Argyle was a resident of England, he began working for a company known as City Electrical Factors, Ltd. ("CEF").

7. CEF is a subsidiary of a company known as CEF Holdings, Ltd. ("CEF Holdings").

8. CEF Holdings is a privately held company having a principal place of business in the United Kingdom, which is engaged, along with its subsidiaries and various affiliates, in the sale of wholesale electrical and trade equipment to electricians.

9. CEF Holdings is owned and controlled by the Mackie family. The family includes Tom Mackie (the eldest and founder), his son Gerald Mackie, and Gerald Mackie's two sons, Ashley Mackie and Adam Mackie. The Mackie family split up the company and its worldwide subsidiaries geographically and each Mackie controls the subsidiary entities and stores in his geographic region.

10. CEF Holdings, and its various subsidiaries, have several corporate branch offices and stores which have and continue to do business throughout the United States.

11. After working for CEF in England for several years, Argyle was promoted to Branch Manager, responsible for managing a single CEF supply store.

12. Argyle was later promoted to Group Manager, responsible for managing 9 branch managers in England.

13. In or around March, 2001, Ashley Mackie approached Argyle about moving to the United States to open up branches of a subsidiary of CEF Holdings, Concord Electric, in the Greater Boston, Massachusetts area.

14. Since Argyle was already a Group Manager, he was only interested in moving to the United States if he was promoted to General Manager. Accordingly, Argyle informed Ashley Mackie that he was only interested in moving his family to the United States to open new branch stores for Concord Electric if he was assured of a promotion to a General Manager position.

15. Ashley Mackie promised Argyle that if he moved to the United States, he would be, along with Jim Lawson, Ashley Mackie's "first General Managers in North America."

16. Until Argyle was promoted to General Manager, Ashley Mackie decided that he would be promoted to the position of Senior Group Manager. As Senior Group Manager, Argyle had the responsibility of opening and managing a group of 8 branch stores, as well as overseeing another Group Manager, Gary Wordsworth who managed 8 other branch stores in the Greater Boston area.

17. Ashley Mackie assured Argyle a promotion to General Manager as long as he opened 8 branch stores in the Greater Boston area, and adequately performed his

duties relative to the management and sales of his 8 branches, as well as the 8 branches under the direct management of Gary Wordsworth.

18. Relying on Ashley Mackies' promises and assurances, Argyle relocated himself and his family to the United States in August, 2001.

19. But for Ashley Mackies' promises and assurances, Argyle would not have uprooted his family and relocated himself and his family to the United States.

20. After relocating to the United States, Argyle was employed full-time by Concord Electric as a Senior Group Manager of the Boston South group and the Boston North group, earning an annual salary of approximately $235,000.00.

21. Concord Electric is a foreign corporation organized under the laws of Great Britain and, at relevant times herein, was registered to do business in the Commonwealth of Massachusetts, with a principal place of business located at 2377 Boston Road, Unit 2, Wilbraham, Massachusetts.

22. Argyle was employed by Concord Electric from August, 2001 until February 14, 2008, when the company unceremoniously terminated his employment.

23. From August, 2001 to August, 2002, Argyle opened 8 stores in the Greater Boston area, while Gary Wordsworth only opened 3-4 branch stores.

24. By the end of 2004, Gary Wordsworth and Argyle had opened a total of 16 branches between their two groups.

25. At the end of 2004, Argyle's two groups were performing as well or better than other newly formed groups.  First, his groups were not expected to turn a profit right away.  Concord Electric's history of opening stores in the United States shows that groups in Florida and the Carolinas were not profitable for the first 10

– 15 years after their establishment. Additionally, two groups that opened around the same time in Washington and Philadelphia, had $5 million less in net sales than his two groups, $1.6 million less gross profit than his two groups, and a worse net profit trajectory than his two groups, based on the company's own reports. Moreover, the company's own reports indicate that during FY 2004, his two groups showed increased gross profit percentage over FY 2003, with sales increasing 72% from 2003- 2004 sales. This comparative evidence shows that his performance for 2001 to 2004 was solid.

26. In or around March, 2006, he met with Ashley Mackie for three primary reasons: (1) to discuss his complaint about the failure of the company to promote him to a General Manager; (2) discuss the freeze that had been placed upon his pension plan account; and, (3) come up with a plan to resolve the promotion and pension plan issues going forward. At this meeting, Mr. Mackie reassured him that the option of being promoted to General Manager was still a realistic expectation. Mr. Mackie also authorized him to open 2 additional branches in the Boston area. Further, Mr. Mackie approved a $65,000 annual salary increase for him, bringing his annual salary to $300,000. Finally, Mr. Mackie told him not to worry because the salary increase was only a temporary fix for the company's delay in promoting him to General Manager, as well as the delay in resolving the freeze that had been placed upon his pension plan account several years ago. Mr. Mackie agreed to get back to him to come up with a solution to these outstanding issues.

27. In July, 2006, Ashley Mackie emailed him and Gary Wordsworth informing them that Mr. Mackie had seen their sales figures and that they were "outstanding."

28. In the summer of 2006, Ashley Mackie visited the stores in the United States, including those in the Greater Boston area.  During his tour of his branches, Ashley Mackie informed him that he was happy with his branches, that everything was well, and that his performance was meeting his expectations.

29. In March, 2007, Concord Electric Supply issued a report to its General Managers and Senior Group Managers entitled "TOP 10 BAD DEBTS AS [OF] MARCH 25, 2007 CES ACROSS THE USA."  This report was issued to these managers for the purpose of reducing bad debt which resulted from poor credit management practices.  Notably, none of the Boston groups were listed in this report and it is believed that the bad debts of the 10 branches named in the report greatly exceeded the bad debts of the various Greater Boston groups.

30. In April of 2007 (after the company's year-end for FY 2005-2006 in March, 2007), Ashley Mackie wrote him an e-mail congratulating him and Gary Wordsworth, saying "well done on your progress," "definitely in the right direction," and "fantastic."  Around the same time, Keith Nichols emailed him to inform him that he [Mr. Nichols] had a conversation with Ashley Mackie, and that Mr. Mackie had stated that he had done a "superb" job in reducing the Boston groups' losses.  As a result of his performance during FY 2005-2006, he received a performance-based incentive bonus of $25,000.00 for reducing losses for his two groups to less than $1,000,000 dollars.  Upper level management gave every indication that his sales performance during 2005- 2006 was very good.

31. In December, 2007, he still had not received his promotion to General Manager as promised by Ashley Mackie. In a meeting with Mr. Mackie, Mr. Argyle reminded him about his assurance and Mr. Mackie again reiterated that the promotion to General Manager was still planned.

32. As of January, 2008, the sales figures also indicated that his various Greater Boston groups were performing well relative to other regions. According to a Concord Electric report entitled "USA Branch Net Sales League Table 2007/2008," the top performing group out of a total of 61 groups in the United States was the Charlotte West Group which had sales of $19.6 million year to date. That same report indicates that as of January, 2008, the Boston North Group was ranked 22 out of 61, having net sales of $10.4 million year to date and that the Boston South Group was ranked 28 out of 61, having net sales of $9.03 million year to date. Additionally, the report indicates that there were a total of 12 regions in the United States as of January, 2008, that the groups in Keith Nichol's region (which included his Boston North and South groups), had earned a total of $25.7 million year to date, ranked 8 out of 12 in net sales year to date, and that the regions ranked 9th to 12th place earned a <u>combined</u> $14 million in net sales year to date.

33. Despite his positive performance, Ashley Mackie, Concord Electric, and CEF Holdings subjected him to unfair and discriminatory treatment based on his age, throughout the course of his employment.

34. During his employment with Concord Electric, Mr. Argyle's disciplinary record was exemplary. He received no meaningful discipline whatsoever since his transfer to the United States in August 2001.

35. Despite Ashley Mackies' promises and reassurances that he would be promoted to General Manager, his positive sales trends, increasing compensation, and his clean disciplinary record, Concord Electric terminated his employment in February, 2008. In connection with the termination of his employment, an agent of Concord Electric informed him simply that "things weren't working out" and the company "wanted to make a change."

36. After terminating his employment, the company split his former Greater Boston branch stores into three groups – the Boston South group, the Boston Central group, and the Boston North group. Gary Wordsworth, his former subordinate, was assigned to be the Group Manager of the Boston North Group. The company promoted two of its Branch Managers, Jaime Marujo and Lou Katsos, and assigned those individuals to be Group Managers of the Boston South groups and the Boston Central groups, respectively.

37. On information and belief, Gary Wordsworth is substantially younger than Mr. Argyle is, and has far less experience and qualifications than Mr. Argyle has. Jaime Marujo was 32 years old (15 years younger) at the time he replaced Mr. Argyle as Group Manager of the Boston South group. Jaime Marujo had less experience and fewer qualifications at the time he replaced Mr. Argyle.

38. Mr. Marujo: (1) had much less experience in wholesaling than Mr. Argyle did, (2) had much less experience in management than he did, (3) had much less company

knowledge than he did, (4) was a primary contributor to his former groups' bad debt, and (5) was experiencing poorer sales performance compared to his prior fiscal year.

39. Mr. Katsos was less experienced and qualified than Mr. Argyle was at the time Mr. Katsos replaced him.  Mr. Katsos: (1) had much less experience in management than he did, (3) had much less company knowledge than he did, and (4) was experiencing a decrease in sales and gross profits at the Lynn branch in excess of 20% as compared to his prior fiscal year.

40. The Boston groups have performed poorly in comparison to the sales performance Mr. Argyle achieved during the course of managing those groups.

41. On information and belief, Concord Electric and CEF Holdings possess trading sheets (profits and loss reports) in the United Kingdom, which contain the age of each of the company's employees in addition to the employees' profits earned and losses incurred.  Concord Electric Supply and CEF Holdings use these trading sheets and consider the age of their employees in making decisions relative to assignments, and the award of salaries, bonuses, and promotions.  In recent years, the company has discharged approximately seven managers and replaced them with less-qualified, younger employees.

42. In or around April 23, 2010, Concord Electric withdrew its foreign registration in Massachusetts.  City Electric has taken over Concord Electric's operations in the Commonwealth, though it continues to use the "Concord Electric" name in its business transactions.

43. The Plaintiff has suffered and will continue to suffer a substantial loss of wages. Following his termination, he was forced to sell his family home at a substantial loss. The humiliation, embarrassment, shame, and emotional distress that he has suffered as a result of his wrongful termination continue to this day.

44. During his employment, Argyle earned "in-house factory bonuses" that were held by Concord Electric for future payment to Argyle. At the time of his termination, Argyle had earned in-house bonuses totaling approximately $4,000. The Defendants failed, refused, or neglected to pay these earned funds to Argyle.

## IV.   COUNTS OF THE COMPLAINT

### COUNT ONE
### BREACH OF CONTRACT
*Argyle v. All Defendants*

45. The Plaintiff hereby restates and incorporates each paragraph of this Complaint, as if fully stated herein.

46. Argyle and the Defendants entered into a binding agreement whereby Argyle would relocate to the United States and serve as Senior Group Manager of the Greater Boston region, and the Defendants would make Argyle the first General Manager under Ashley Mackie in the United States.

47. Argyle performed his duties under this agreement.

48. During Argyle's employment, the Defendants repeatedly reaffirmed their promise to make Argyle a General Manager, and Argyle affirmed his commitment to remain in the United States.

49. The Defendants breached their obligations to Argyle under this agreement.

50. The Defendants agreed to hold Argyle's in-house factory bonuses for later payment. However, the Defendants breached their obligation to pay these funds to Argyle.

51. As a result of the Defendants' breach, the Plaintiff has suffered damages.

## COUNT TWO
## PROMISSORY ESTOPPEL
*Argyle v. All Defendants*

52. The Plaintiff hereby restates and incorporates all paragraphs of this Complaint as if fully stated herein.

53. The Defendants made the representation that they intended to make Argyle a General Manager in order to induce Argyle to relocate to and remain in the United States.

54. Argyle reasonably relied on this representation and, as a result, suffered detriment.

## COUNT THREE
## AGE DISCRIMINATION
## (M.G.L. c. 151B)
*Argyle v. All Defendants*

55. The Plaintiff hereby restates and incorporates all paragraphs of this Complaint as if fully stated herein.

56. At the time of his termination, Argyle was over forty years of age. He performed the duties of his position satisfactorily, yet was terminated due to his age.

57. The Defendants' actions in terminating the Plaintiff were egregious and outrageous, and they constitute a willful or knowing violation of M.G.L. c. 151B.

58. The Plaintiff has exhausted his administrative remedies.

59. As a result of the Defendants' actions, the Plaintiff has suffered damages.

## COUNT FOUR
## NON-PAYMENT OF WAGES
## (M.G.L. c. 149 § 148)
*Argyle v. All Defendants*

60. The Plaintiff hereby restates and incorporates all paragraphs of this Complaint as if fully stated herein.

61. The Plaintiff earned $4,000 in bonuses that had accrued over a period of years and were due and owing at the time of his termination.

62. The Defendants failed, refused, or neglected to pay these funds to Argyle. The Defendants' failure to pay these wages was willful and knowing.

63. The Plaintiff has exhausted his administrative remedies.

64. As a result of the Defendants' actions, the Plaintiff has suffered damages.

**V.     PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, Stephen Argyle, hereby requests the following relief:

1. Compensatory damages, including lost pay and emotional distress;
2. Multiple damages;
3. Punitive damages;
4. Treble damages for unpaid wages;
5. Attorney's fees and costs of this action;
6. Prejudgment and postjudgment interest; and
7. Such further relief as the Court deems fair and just.

**V.    JURY DEMAND**

The Plaintiff demands a TRIAL BY JURY as to all issues and counts so triable.

Respectfully submitted,
Stephen Argyle
By his attorneys,


*/s/ David E. Belfort*                                    Dated: December 2, 2010
David E. Belfort (BBO# 634385)
dbelfort@bennettandbelfort.com
Michael L. Mason (BBO# 662244)
mmason@bennettandbelfort.com
Bennett & Belfort, P.C.
24 Thorndike St., Suite 300
Cambridge, MA 02141
(617) 577-8800